UNITED STATES DISTRICT COURT                      b
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

ELIZABETH MICHELE                CIVIL ACTION 1:17-CV-00500
GAUTHIER

VERSUS                           JUDGE TRIMBLE

U.S. COMMISSIONER, SOCIAL        MAGISTRATE JUDGE PEREZ-MONTES
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Elizabeth Michele Gauthier ("Gauthier") appealed the Commissioner's decision to deny her claim for social security supplemental security income ("SSI"). Because substantial evidence supports the Commissioner's decision, Gauthier's appeal should be denied.

## I.    Background

### A.    Procedural History

Elizabeth Michele Gauthier ("Gauthier") filed an application for SSI on December 10, 2014, alleging a disability onset date of August 9, 2009 (Doc. 4-1, p. 125/487), due to degenerative disc disease, "sterois scoliosis," facet disease, facet arthritis, osteoarthritis, onset rheumatoid arthritis, nerve damage in left leg, nerve damage in right arm, sciatica, and neuropathy (Doc. 4-1, p. 142/487).[1]   That application was denied by the Social Security Administration ("SSA") (Doc. 4-1, p. 78/487).

---

[1] Gauthier filed two prior applications.  One was denied after an administrative hearing on May 24, 2011, and Gauthier did not seek review.  The other application was denied initially on May 2, 2014 (Doc. 4-1, pp. 149-150/487), and Gauthier did not request a hearing.

A de novo hearing was held before an administrative law judge ("ALJ") in 2016, at which Gauthier appeared with her attorney and a vocational expert ("VE") appeared (Doc. 4-1, p. 28/487).

The ALJ found that, although Gauthier suffers from severe impairments of degenerative disc disease and dysfunction of major joints (Doc. 4-1, p. 16/487), she has the residual functional capacity to perform light work except: (1) no extreme range of motion with her neck; (2) no over-shoulder work with her right upper extremity; and (3) she can do frequent, but not constant, handling (Doc. 4-1, p. 17/487). The ALJ found Gauthier can do work that exists in substantial numbers in the economy, such as telephone operator, sales support, and weight scale operator, and therefore was not disabled at any time from December 4, 2014 (protective filing date) through the date of his decision on March 1, 2016 (Doc. 4-1, pp. 22-23/487).

Gauthier requested a review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 4-1, p. 4/487). The ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Gauthier next filed this appeal for judicial review of the Commissioner's decision. Gauthier contends the ALJ ignored and did not address evidence of Gauthier's disability adduced at the hearing (Doc. 8), including: (1) a January 2010 nerve conduction study of the right upper extremity; (2) Gauthier's obesity; (3) an October 2015 MRI of her cervical spine; (4) Gauthier's objection to Dr. Cormier's consultative medical exam; (5) Gauthier's testimony; and (6) the VE's testimony.

The Commissioner filed a response to Gauthier's appeal (Doc. 9), to which Gauthier replied (Doc. 10).

B.    <u>Medical Records</u>

In September 2012, Gauthier was evaluated for headaches, fatigue, neck pain, and insomnia by Dr. Mohammad Zeibo at the Neurology and Sleep Center (Doc. 4-1, p. 460-65/487).    A polysomnogram revealed few obstructive evens but multiple awakenings (461/487).    Dr. Zeibo diagnosed fibromyalgia, headaches, and neck pain, recommended weight reduction, good sleep hygiene, and that she stop smoking, and prescribed Vistaril (Doc. 4-1, p. 461, 465/487).

Gauthier was seen by Dr. Gonzalo I. Hidalgo, a neurologist, in February 2013, on referral from her former neurologist (Doc. 4-1, p. 210/487).    Dr. Hidalgo noted Gauthier had a long history of lower back pain and a history of lower back surgery (Doc. 4-1, p. 210-487).    Gauthier had new pain in her neck radiating to the right upper extremity and pain in her lower back radiating to the left lower extremity (Doc. 4-1, p. 210/487).    Gauthier complained of burning pain, numbness, tingling, lower back pain, neck pain, and weakness (Doc. 4-1, p. 210/487).    Gauthier also complained of throbbing, stabbing occipital headaches with diplopia, photophobia, phonophobia, nausea, and vomiting (Doc. 4-1, p. 210/487).    Stress was a precipitating factor for her headaches (Doc. 4-1. P. 210/487).    Gauthier was 5' 5" tall, weighed 200 pounds, and her blood pressure was 122/88 (Doc. 4-1, p. 211/487).    Gauthier's gait was normal, and the strength in her extremities was normal (Doc. 4-1, p. 211/487).    Dr. Hidalgo diagnosed cervical radiculopathy, lumbar radiculopathy, tension headaches, and

cerebral atherosclerosis, and prescribed Neurontin, Pepcid, and Zanaflex (Doc. 4-1, p. 213/487).

A February 2013 MRI of Gauthier's cervical spine showed degenerative changes with significant spinal stenosis (Doc. 4-1, pp. 215-16, 445-46/487). Dr. Hidalgo re-examined Gauthier in March 2013, diagnosed spinal stenosis and lumbar radiculopathy, and prescribed Tramadol and Zanaflex (Doc. 4-1, pp. 217-220/487). In April 2013, EMG studies and motor nerve conduction studies showed evidence of early carpal tunnel, but no evidence of myopathy, neuropathy, or radiculopathy (Doc. 4-1, p. 223/487).

An anterior cervical discectomy and fusion at C4-5 and C5-6 was performed in April 2013 by Dr. Donald R. Smith (Doc. 4-1, pp. 242-48/487).

In December 2013, Dr. Zeibo diagnosed headaches, fibromyalgia, and neck pain, and prescribed Lorcet, Neurontin, and weight reduction (Doc. 4-1, pp. 281, 460/487). In January 2014, Gauthier had a normal awake and sleep routine EEG (Doc. 4-1, pp. 279, 458/487). In March and June 2014, De. Zeibo evaluated her for headaches and fibromyalgia neck pain, and prescribed Lortab, Norco, Soma, massage therapy, and weight reduction (Doc. 4-1, pp. 275, 278/487). In October 2014, Dr. Zeibo prescribed Norco, Soma, back exercises, massage therapy, Tylenol, and weight reduction (Doc. 4-1, p. 274, 439/487). In December 2014, Dr. Zeibo diagnosed back pain, fibromyalgia, and headaches, and prescribed Soma, back exercises, Tylenol, and weight reduction (Doc 4-1, p. 272/487).

Gauthier had a cardiology consult with Dr. Deborah Cortlandt in September 2014. Dr. Cortlandt diagnosed shortness of breath with atypical chest pain, chronic pain, and hypotensive response to inhibitors suggesting renal artery stenosis (Doc. 4-1, pp. 251-56, 335/487). An echocardiogram showed normal LV systolic function and no significant valvular abnormalities (Doc. 4-1, pp. 255-56, 335, 340, 435/487). A nuclear study showed normal but pharmacologic stress test, ischemia, and a 65% ejection fraction (Doc. 4-1, pp. 258, 335/487).

In October 2014, Dr. Cortlandt saw Gauthier after a cardiac catheterization (Doc. 4-1, p. 265/487). Gauthier's coronary arteries were normal, with no plaque and a normal ejection fraction (Doc. 4-1, p. 265/487). Dr. Cortlandt noted that, since starting Lasix and potassium, the edema in Gauthier's legs and discomfort in her ankles had resolved (Doc. 4-1, p. 265/487). Dr. Cortlandt diagnosed unspecified hypothyroidism, unspecified myalgia and myositis, and unspecified venous (peripheral) insufficiency, abnormal cardiovascular system, and chest pain (Doc. 4-1, pp. 266, 326, 329, 419/487). Dr. Cortlandt prescribed Ultram, Celexa, Zantac, Mobic, ProAir, Soma, Neurontin, and Lasix (Doc. 4-1, pp. 326/487).

Gauthier was treated for headaches, back and neck pain, and fibromyalgia by Dr. Zeibo in March, May, August, and November 2015; prescribed Percocet and Soma; and told to lose weight (Doc. 4-1, pp. 443, 444, 452, 457/487).

In April 2015, Dr. Kevin Cormier evaluated Gauthier at the request of Disability Determinations Services (Doc. 4-1, pp. 282-85, 448-49/487). Dr. Cormier found a past anterior cervical discectomy and fusion at C4-6 with associated mild

degenerative changes, limited range of motion of the cervical spine, limited abduction of the right shoulder to 90 degrees, a mild limp with no significant balance issues, and a squat range of motion that was 50% of normal (Doc. 4-1, p. 285/487). Dr. Cormier stated that Gauthier should be able to sit, walk, and/or stand for a full workday, lift/carry objects without limitations, hold a conversation, respond appropriately to questions, and carry out and remember instructions (Doc. 4-1. P. 285/487). Dr. Cormier also found that Gauthier's limited range of motion of the right shoulder abduction would limit her ability to perform activities requiring overhead movement of the right arm. Dr. Cormier further noted that Gauthier is not dependent on an assistive device for ambulation (Doc 4-1, p. 285/487).

In April 2015, Gauthier complained of pain in her shoulders, hands, knees, elbows, neck, and back (Doc. 4-1, p. 402/487). Dr. Mehwish Khan, a rheumatologist, noted Gauthier had been treated by the neurosurgery clinic since June 2013 (Doc. 4-1, p. 402/487). Dr. Khan found Gauthier does not respond to narcotics, and finds it difficult to perform daily activities due to pain (Doc. 4-1, p. 402/487). Gauthier also complained of intermittent swelling of the joints, as well as joint pain and stiffness (Doc. 4-1, p. 402/487). Gauthier's past diagnoses included arthritis, migraines, scoliosis and rheumatoid arthritis (Doc. 4-1, p. 403/487). Her blood pressure was 124/82 and she weighed 216 pounds (Doc. 4-1, p. 404/487). X-rays showed degenerative changes in Gauthier's spine that indicated arthritis (Doc. 4-1, pp. 416-17/487). Gauthier did not have any acute cardiopulmonary process (Doc. 4-1, p. 417/487). X-rays of Gauthier's feet and hands were unremarkable (Doc. 4-1, pp. 413-

14, 416/487).  Dr. Mehwish prescribed Ultram for pain and ordered tests (Doc. 4-1, p. 404/487).

In May 2015, Dr. James Lee examined Gauthier and found she had abdominal pain in the upper right quadrant (Doc. 4-1, p. 400/487).

In June 2015, Dr. Zeibo was informed by Louisiana Healthcare Connection that Gauthier had received narcotics medications, prescribed by at least three different doctors, within a 30 day period (Doc. 4-1, p. 440/487).  Dr. Zeibo responded, however, that he was working in conjunction with the other prescribers (Doc. 4-1, p. 440/487).

In July 2015, Gauthier was diagnosed with dysthymia secondary to multiple health conditions and pain by a counselor/social worker, and was referred for a psychiatric evaluation (Doc. 4-1, p. 347/487).

In October 2015, Gauthier complained she had sprained her neck when she turned her head while driving (Doc. 4-1, p. 467/487).  An MRI of Gauthier's cervical spine in October 2015 showed her previous surgical changes with degenerative changes, and significant spinal stenosis slightly worse above the previous fusion and at T2-3 (Doc. 4-1, pp. 480, 485-86/487).  Gauthier was diagnosed with cervical degenerative disc disease, Tramadol was prescribed, and physical therapy was recommended (Doc. 4-1, p. 480-81, 485, 487/487).  Gauthier's pain worsened in November and she was told to wear a "soft collar" (Doc. 4-1, p. 477/487).

## C.    <u>Administrative Hearing</u>

At the January 2016 administrative hearing, defense counsel objected to a consultative exam report by Dr. Kevin Cormier with the Southern Medical Group, Inc., arguing there is no Dr. Kevin Cormier listed with the Louisiana State Medical Society (Doc. 4-1, pp. 30, 283/487).   The ALJ assured him he would check Dr. Cormier's licensure (Doc. 4-1, p. 31/487).

Gauthier testified that she is 36 years old, right-handed, 5'5" tall, and weighs about 210 pounds (Doc. 4-1, pp. 31-32/487).   Gauthier lives with her boyfriend, who is disabled (but not on disability), her three children (8, 13, and 14 years old), and his daughter (15 years old) (Doc. 4-1, p. 32/487).   Gauthier does not have any income (Doc. 4-1, p. 32/487).   Gauthier drives an automatic transmission car, graduated from high school in regular classes, can read, write, and do basic arithmetic, and has had CNA (certified nursing assistant) training (Doc. 4-1, p. 33/487).

Gauthier testified that she last worked at the end of 2008 (when her son was born) as a part-time substitute teacher (Doc. 4-1, p. 34/487).   Gauthier has also worked as a security guard and a stocker at Wal-Mart (full time for one year in the 1990s) (Doc. 4-1, p. 34/487).   Gauthier has done housecleaning part-time and worked as a waitress for about a year (Doc. 4-1, p. 35/487).

Gauthier testified that her neck is stiff and does not turn well; she has headaches now and then; her back, right shoulder and arm bother her; and her right hand goes numb, so she has difficulty gripping and drops things (Doc. 4-1, p. 36/487). Gauthier's legs and fingers swell, and she has weakness in her legs (Doc. 4-1, p.

36/487).  Gauthier's hand goes numb every day for 30 minutes to an hour, sometimes two or three times per day, then it tingles until the feeling returns (Doc. 4-1, pp. 36-37/487).  Gauthier has swelling in her fingers every day, so she cannot close her hands, and her feet are swollen when she wakes up in the mornings, so she has difficulty walking (Doc. 4-1, pp. 36-37/487).  About three mornings per week, she cannot put on her shoes and has to wear slippers (Doc. 4-1, p. 38/487).  Gauthier takes Lasix, which helps (Doc. 4-1, pp. 37-38/487).  Gauthier has had swelling in her hands, arms, legs, and feet for about two years (Doc. 4-1, p. 54/487).  Gauthier's cardiologist treats her for the swelling (Doc. 4-1, p. 55/487).

Gauthier testified she has taken oxycodone for pain for the last year, and was taking Norco before that (Doc. 4-1, p. 38/487).  Between doses of oxycodone, Gauthier takes tramadol and ibuprofen (Doc. 4-1, p. 38/487).  Gauthier testified the pain medications relieve a lot of her pain but do not alleviate it completely (Doc. 4-1, p. 39/487).  Her medications make her sleepy (Doc. 4-1, pp. 56-57/487).

Gauthier testified that it takes her a while to get out of bed in the mornings, and the children usually get themselves up and dressed (Doc. 4-1, p. 39/487).  She assists the children with their homework if they need help (Doc. 4-1, p. 394/487).  Gauthier does not go to school conferences (Doc. 4-1, p. 39/487).

Gauthier testified that she smokes about half a pack of cigarettes each day and rarely drinks alcohol (Doc. 4-1, p. 40/487).

Gauthier is able to grocery shop with help (Doc. 4-1, p. 40/487).  She does not carry anything over five pounds (Doc. 4-1, p. 40/487).  She can stand for up to 30

minutes, then she has to move around, and then lie down with her feet propped up (Doc. 4-1, p. 41/487). Gauthier has to lie down every day for 30 minutes to two hours (Doc. 4-1, p. 41/487). Gauthier drives on her good days, two or three days per week, for up to five miles (Doc. 4-1, p. 41/487). Gauthier does laundry with help and cooks on her good days with help (Doc. 4-1, p. 42/487). Gauthier gets along with her family and attends church when she can (Doc. 4-1, p. 42/487). Gauthier's boyfriend drives her to physical therapy two to three times per week (Doc. 4-1, pp. 42-43/487).

Gauthier said she is using a TENS unit, electrotherapy, and moist heat, but is still hurting (Doc. 4-1, p. 43/487). Gauthier said her doctor will do surgery if the physical therapy does not work because her pain is caused by bone spurs (Doc. 4-1, p. 44/487). Gauthier said she is aware that smoking can affect her ability to heal after surgery, she has already had back and neck surgeries, and that is why she has reduced her smoking from one pack per day to half a pack per day (Doc. 4-1, p. 45/487). Gauthier's last pregnancy worsened her back problem (Doc. 4-1, p. 46/487). Gauthier wants to return to work (Doc. 4-1, p. 45/487).

Gauthier testified she also has nerve damage and carpal tunnel syndrome, so she has trouble gripping things (Doc. 4-1, p. 46/487). Gauthier testified she can tie shoelaces if she is able to bend down (Doc. 4-1, p. 46/487).

Gauthier has had a fusion on her lower back by Dr. Donald Smith, a neurosurgeon (Doc. 4-1, pp. 46-47/487). The surgery did not cure her back problems, and she still has pain that radiates from her low back down her left leg (Doc. 4-1, p. 47/487). Gauthier wears a brace for her low back (Doc. 4-1, p. 48/487). Sometimes

she cannot bend, or she has to lay on the floor with her feet propped up to relieve the pain (Doc. 4-1, p. 47/487).

Gauthier also had a surgical fusion on her neck (Doc. 4-1, p. 48/487). Gauthier can look up but she cannot look down (Doc. 4-1, p. 48/487). Gauthier is unable to do any kind of work that requires her to look down, such as at a desk (Doc. 4-1, p. 47/487). Gauthier has to hold her cell phone up to look at it (Doc. 4-1, p. 47-48/487). Gauthier cannot look behind her or look side to side when she is backing up her car (Doc. 4-1, p. 49/487). Her passengers help her with backing up and looking both ways, or she has to turn her entire body (Doc. 4-1, p. 49/487). Gauthier's neck pain causes headaches (Doc. 4-1, p. 49/487).

Gauthier testified that, although she told one of the doctors that she can sit for six hours, she meant six hours in one-hour intervals (Doc. 4-1, p. 47/487). Gauthier has to get up and move around a little between sitting intervals (Doc. 4-1, p. 47/487). However, when Gauthier sits and elevates her feet, she has to stay in that position for a while (Doc. 4-1, p. 48/487).

Gauthier's carpal tunnel and neck problems cause right hand numbness (Doc. 4-1, p. 49/487). Gauthier also has trouble with her right shoulder, probably due to her neck problems (Doc. 4-1, pp. 49-50/487). Gauthier cannot lift her right arm all the way up (abduction) (she is right-handed) (Doc. 4-1, p. 50/487). Gauthier cannot lift her right elbow even with her shoulder (Doc. 4-1, p. 50/487).

Gauthier testified she has good and bad days (Doc. 4-1, p. 51/487). On a bad day, she is not able to get out of bed, so she needs help getting up or her children have

11

to take her things in bed (Doc. 4-1, p. 51/487).  On good days, Gauthier can do certain things with help (Doc. 4-1, p. 51/487).  Gauthier has more bad days than good days (Doc. 4-1, p. 51/487).  Gauthier testified that her children, her boyfriend, her mother, her friends, and her neighbors help her around the house (Doc. 4-1, p. 56/487).

As a substitute teacher, Gauthier would follow the teacher's lesson plan and tell the children to do the work assigned (Doc. 4-1, p. 52/487).  When she worked as a nighttime stocker at WalMart, Gauthier worked from 8:00 or 9:00 p.m. until 6:00 a.m. (Doc. 4-1, p. 52/487).  Stocking involved loading a cart from the stock room and putting the merchandise on the shelves (Doc. 4-1, p. 53/487).  Gauthier worked as a stocker before she had her surgeries (Doc. 4-1, p. 53/487).

Gauthier testified that, when she drives, she has to use her arms to pull herself out of the vehicle because she is so stiff (Doc. 4-1, p. 53/487).  When she gets into a vehicle, she falls down onto the seat, then sometimes has to sit and wait for her back to stop spasming (Doc. 4-1, pp. 53-54/487).  Gauthier can travel in a vehicle for about 25 minutes before she has to get out and walk and stretch (Doc. 4-1, p. 54/487).

Gauthier testified that she was supposed to start physical therapy, but delayed doing so because her car was not running and she had difficulty finding a physical therapist who would take Medicaid (Doc. 4-1, pp. 55-56/487).  Gauthier drives to Winnfield for physical therapy (Doc. 4-1, p. 56/487).

The VE testified that Gauthier's past work as a house cleaner was heavy, unskilled, SVP 2 (DOT 323.687-018[2]); her past work as a substitute teacher was light,

---

[2] Dictionary of Occupational Titles.

SVP 5 (DOT 092.227-010); her past work as a certified nursing assistant was medium, SVP 4 (DOT 355.674-014); her past work as a security guard was light, SVP 3 (DOT 372-667-037); and her past work as a stocker was heavy, SVP 4 (DOT 299.367-014) (Doc. 4-1, p. 58/487).

The ALJ posed a hypothetical involving a person of Gauthier's age, education, and work experience, who can lift/carry 20 pounds occasionally and 10 pounds frequently; can stand/walk for six hours, can sit for six hours, and cannot do over-shoulder work with the right arm; can do work which requires her to move her neck, but no extreme ranges of neck motion (such as having to turn her head to operate heavy equipment); and cannot do constant handling or fingering, but can do it frequently (Doc. 4-1, pp. 58-59/487). The VE testified that such a person could work as a: (1) telephone operator (telemarketer)–DOT 237.367-010, sedentary, unskilled, SVP 2 (10,280 jobs nationally, 110 jobs in Louisiana); (2) sales work–DOT 299.357-014, sedentary, SVP 3 (82,330 jobs nationally, 240 jobs in Louisiana); or (3) weight scale operator–DOT 929.686-050, light, unskilled, SVP 2 (69,870 jobs nationally; 740 jobs in Louisiana) (Doc. 4-1, pp. 59-61/487).

The VE further explained that, if the person's right hand was to go numb for 30 minutes to an hour, during which time she could not use it, and she has to lie down for about an hour during the workday after sitting and standing for an hour or two, she would not be able to do any job on a sustained basis (Doc. 4-1, p. 60/487). The VE also stated she would not be able to do any work if she has some good days and

13

some bad days, and swelling causes her to miss three or four days per month (Doc. 4-1, p. 60/487).

**D.**   <u>ALJ's Findings</u>

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Gauthier (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  See <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 514 U.S. 1120 (1995) (citing <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  <u>Greenspan</u>, 38 F.3d at 237.

In the case at bar, the ALJ found that Gauthier has not engaged in substantial gainful activity since December 4, 2014, and that she has severe impairments of degenerative disc disease and dysfunction of major joints, but that she does not have

an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 4-1, pp. 16-17/487). The ALJ also found that Gauthier is unable to perform any of her past relevant work (Doc. 4-1, p. 17/487).

At Step No. 5 of the sequential process, the ALJ further found that Gauthier has the residual functional capacity to perform the light work except as reduced by no extreme range of motion with her neck, no over-shoulder work with the right upper extremity, and no constant (but can do frequent) handling (Doc. 4-1, p. 17/487). The ALJ found that Gauthier is a younger individual with at least a high school education and that transferability of work skills is immaterial (Doc. 4-1, p. 21/487). The ALJ concluded there are a significant number of jobs in the national economy that Gauthier can perform, such as telephone operator, sales support, and weight scale operator and, therefore, Gauthier was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on March 1, 2016 (Doc. 4-1, pp. 22-23/487).

## II.   Law and Analysis

Gauthier contends the ALJ ignored and did not address some of the evidence adduced at the hearing (Doc. 8): (1) a January 2010 nerve conduction study of the right upper extremity; (2) Gauthier's obesity; (3) an October 2015 MRI of her cervical spine; (4) Gauthier's objection to Dr. Cormier's consultative medical exam; (5) Gauthier's testimony; and (6) the VE's testimony.

A.    <u>Scope of Review</u>

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  <u>See</u> <u>McQueen v. Apfel</u>, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion.  It must be more than a scintilla but need not be a preponderance.  <u>See</u> <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  <u>See</u> <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  <u>See</u> <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  <u>See</u> <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981); <u>see also</u> <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  <u>See</u> <u>Dellolio</u>, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a

court must conclude there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

**B.   Substantial evidence supports the ALJ's findings as to the severity of Gauthier's symptoms.**

Gauthier contends the ALJ stated on page seven of his decision: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." Gauthier further contends the ALJ stated, in the next paragraph, that: "The evidence does not indicate that the claimant's impairments are as severe as alleged. Although claimant testified to multiple conditions at the hearing, there is no support for these allegations." The ALJ qualified his statement as to Gauthier's symptoms by adding: "[T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Doc. 4-1, p. 20/487). Therefore, "these allegations" appears to refer to the severity of Gauthier's symptoms. The ALJ said Gauthier's impairments are not as severe as alleged, and noted the inconsistencies between some of her complaints and her daily activities (Doc., 4-1, p. 20/487).

Gauthier contends these statements are inconsistent, and alleges the ALJ did not consider a nerve conduction study conducted in January 2010 of her right upper extremity that showed carpal tunnel syndrome, which still existed at the time of the hearing. However, the ALJ specifically mentioned and considered the 2010 nerve

conduction study in his opinion, finding it revealed right peroneal neuropathy, right L5-S1 radiculopathies, and carpal tunnel syndrome on the right (Doc. 4-1, p. 18/487).

The ALJ found Gauthier's allegations as to the severity (rather than the existence) of her symptoms, to be unsupported. Therefore, the ALJ's statements are not inconsistent. Substantial evidence supports the ALJ's conclusions as to the severity of Gauthier's symptoms.

### C.    The ALJ considered Gauthier's obesity as required by SSR 02-01p.

Gauthier further argues the ALJ did not consider her obesity, with a Body Mass Index[3] ("BMI") exceeding 34, in determining whether claimant had severe impairments. Gauthier contends the ALJ dismissed any finding that claimant's obesity limited her ability to sustain activity on a regular and continuous basis for an eight hour work day and a five day work week, and ignored SS Ruling 02-01P.

Obesity should be considered in combination with other impairments in making the residual functional capacity determination and in discussing the claimant's ability to perform sustained work activities. Beck v. Barnhart, 205 Fed. Appx. 207, 212 (5th Cir. 2006), citing SSR 02-1p, "Evaluation of Obesity." Obesity is not a listed impairment, although it can reduce an individual's occupational base for work activity in combination with other ailments. Beck, 205 Fed. Appx. at 211, citing SSR 02-1p, "Evaluation of Obesity," 2000 WL 628049.

---

[3] "Body Mass Index" is a formula used to determine if a person is overweight. The BMI estimates the level of body fat based on height and weight. A BMI of 30 to 39 indicates obesity. MedlinePlus Health Information, Medical Encyclopedia: Overweight, *available at* https://medlineplus.gov (a service of the U.S. National Library of Medicine, U.S. Department of Health and Human Services, and National Institutes of Health).

The ALJ specifically considered Gauthier's obesity in determining whether her impairments are severe in section three of his decision (Doc. 4-1, p. 17/487). The ALJ explained why Gauthier did not meet a listing under § 1.00, Musculoskeletal Impairments, of Appendix I, and further found that Gauthier's obesity does not have an adverse impact on her co-existing impairments pursuant to SSR 02-01p (Doc. 4-1, p. 17/487). Therefore, the ALJ did not fail to consider Gauthier's obesity.

**D.    The ALJ considered all of the findings in Gauthier's October 2015 MRI.**

Gauthier contends that, on page 6 of the ALJ's decision, the ALJ indicates an MRI of the cervical spine performed on October 9, 2015 showed no significant impingement of the neuroforamen or central thecal sac. Gauthier argues this statement is false and completely misreads the MRI, which states "Significant spinal stenosis is suggested slightly worse at the C3/4 level above the previous fusion. . ."

The October 2015 MRI was interpreted by Dr. Kevin Jeansonne, who found: "The C7/T1 level shows no significant impingement of the neuroforamen or central thecal sac." (Doc. 4-1, p. 442/487). Dr. Jeansonne also found: "Significant spinal stenosis is suggested slightly worse at the 3/4 level above the previous fusion, and on sagittal images at what appears to be T2-3." (Doc. 4-1, p. 442/487).

The ALJ included and discussed both quotes from the MRI interpretation in his decision (Doc. 4-1, p. 19/487). Therefore, the ALJ did not misread the MRI and properly considered all of the findings.

E.   **The ALJ implicitly rejected Gauthier's objection to Dr. Cormier's**
     **consultative medical exam.**

Gauthier contends the ALJ erred in not sustaining claimant's objection to the
report of Dr. Kevin C. Cormier who performed a consultative medical exam on the
claimant.  Gauthier alleges Dr. Cormier was recently licensed in Louisiana with a
specialty in radiologic diagnostics.  At the time of the hearing, he was completing his
residency in diagnostic radiology.  A copy of counsel's objection is attached as Exhibit
No. 1.  Claimant's counsel did not object to Dr. Cormier reviewing and interpreting
the cervical spine x-rays of Ms. Gauthier, but believed his qualifications do not
support a basis for his opinion concerning all the symptomatology of Gauthier's
problems.  Gauthier complains that, in his report, Dr. Cormier omitted any reference
to claimant's previous lumbar discectomy performed at L4-L5 and its residual
limiting effect on her activities, and did not refer to any side effects from her
medication, which included Percocet and Oxycodone.

Dr. Cormier was a licensed medical doctor at the time he performed the
consultative exam, but he had not completed his residency in his specialty of
diagnostic radiology.  As a licensed medical doctor, he was qualified to examine and
report on Gauthier's physical condition.  Dr. Cormier was not employed to interpret
Gauthier's x-rays, but instead to do a full examination.  Dr. Cormier considered
Gauthier's pre-existing x-rays and the radiologic analysis of them that was provided
to him.  When Gauthier objected to Dr. Cormier's qualifications, stating they were
unknown, the ALJ said he would make sure Dr. Cormier was a licensed medical

doctor.  Therefore, the ALJ did not ignore Gauthier's objection, but instead found Dr. Cormier was qualified to give his opinion as to Gauthier's physical condition.

Gauthier also contends Dr. Cormier omitted any reference to her previous lumbar discectomy performed at L4-L5 and its residual limiting effect on her activities.  However, Dr. Cormier noted Gauthier's history of surgeries on both her back and neck (Doc. 4-1, p. 283/487).  Apparently, only Gauthier's cervical x-rays were provided to him (Doc. 4-1, p. 285/487).  Despite the lack of lumbar x-rays, Dr. Cormier checked Gauthier's ranges of motion and found Gauthier was able to bend through the full range of motion for gait/station (Doc. 4-1, p. 284/487).  Gauthier had normal ranges of motion in her lumbar spine, left hip, and right hip (Doc. 4-1, p. 286/487).

Gauthier also complains Dr. Cormier did not discuss her medication side-effects in his report.  However, the only side-effect Gauthier testified about was sleepiness.  Apparently, Gauthier did not report her sleepiness to Dr. Cormier.

The ALJ did not err in accepting and considering Dr. Cormier's report on his physical examination of Gauthier.

**F.    <u>The ALJ did not ignore Gauthier's testimony.</u>**

Gauthier alleges the ALJ ignored her testimony concerning: her right hand going numb for 30 minutes to an hour at least two to three times per day; the swelling in her feet three days per week which causes her difficulty putting on her shoes; her medication side-effect of sleepiness (from Oxycodone and Percocet); the fact that she has to lie down every day 30 minutes to two hours; she cannot sit through a sermon in church;  she wears a lumbar brace; she has had both a lumbar discectomy and

cervical fusion; she has limited motion of her neck; and, prior to her surgeries, she was a stocker at Wal Mart and a substitute teacher.

As long as the ALJ supports his decision with substantial evidence, an ALJ's failure to mention every notation in the medical record does not equate with a failure to consider the evidence.  See Dukes-Ardoin v. Astrue, 2011 WL 3273067 (S.D. Tex. 2011) (citing Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007)); see also Johnson v. Astrue, 2013 WL 4414824, *5 (W.D. La. 2013); Smith v. Astrue, 914 F. Supp. 2d 764, 783-84 (E.D. La. 2012).  Although an ALJ is not always required to do an exhaustive point-by-point discussion of the evidence, his or her decision must be susceptible of thoughtful court scrutiny.  See Johnson v. Comm'r of Social Security, 2013 WL 4414824, *5 (W.D. La. 2013) (citing Audler, 501 F.3d at 448, and Smith 914 F. Supp. 2d at 783-84).

The ALJ specifically noted and considered Gauthier's complaint of numbness and tingling for 30 to 60 minutes in her right hand, swelling in her fingers, legs, and feet, her medication side-effect of sleepiness, her past work as a stocker at WalMart, her previous back and neck surgeries, and the restricted range of motion in her neck (Doc. 4-1, pp. 18-19/487).  The fact that the ALJ did not specifically mention Gauthier's statements that she cannot sit through a church sermon and has to she has to lie down every day 30 minutes to two hours does not mean he did not consider them when making his decision.  He was not required to set forth every consideration and thought he had in making his decision.  The evidence discussed in the ALJ's

opinion demonstrates that his findings and decision are based on substantial evidence.

### F.   The ALJ did not ignore the VE's testimony.

Gauthier contends the ALJ ignored the VE's testimony that there are no jobs available for claimant if her hand goes numb 30 minutes to an hour two or three times per day, or if she can only sit or stand for one or two hours.  Also, if she missed three to four days a month because of her medical problems, there were no jobs available. All the jobs he mentioned required her show up on a regular basis and if she was unable to be at work on an episodic basis, that would preclude her from performing any jobs.

The ALJ adopted the VE's testimony that Gauthier can work since she can perform a limited range of light work.  The ALJ did not adopt the VE's responses to the alternative hypotheticals because he did not accept those hypotheticals.  The ALJ did not ignore that testimony from the VE.

### III.   Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Gauthier's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such

as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS ORDERED AND SIGNED in Chambers at Alexandria, Louisiana on this __18th__ day of April, 2018.

Joseph H.L. Perez-Montes
United States Magistrate Judge

24